UNITED STATES DISTRICT COURT FILED

DISTRICT OF CONNECTICUT 2016 FEB 16 P 1: 29

ABRAHAM RIBICOFF FEDERAL BUILDING US DISTRICT COURT
HARTFORD CT

450 MAIN ST.

HARTFORD CT 06103

CASE NO. 3:15-CV-00124-MPS

United States of America, Ex. Rel.

Joan T. Kloth-Zanard, Christopher R. Zanard                **PLAINTIFF**

     V.

Governor Dannel Malloy,

Roderick L. Brembly, Commissioner of the DSS

Department of Social Services,

Joette Katz, Commissioner of Department of Children and Families,

Danbury Department of Children and Families, and the following agents of the

Department of Children and Family:

Christine Lupke, Jean Norvig, & Carl Graham-Leichner   **DEFENDANTS**

## 3rd AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## NATURE OF THE CASE

1) The Plaintiffs, the United States of America in conjunction with Joan T. Kloth-Zanard

and Christopher R. Zanard, who are residents of New Haven County, and reside at

320 North George's Hill Road, Southbury, CT 06488, had their constitutional rights violated by the defendants. Plaintiff, Joan T. Kloth-Zanard, first had her constitutional rights violated by Department of Social Services, the Governor and Commissioner of DSS in 1995 when they denied her the education she moved to CT to finish.  More to the point, Plaintiff Kloth-Zanard's education rights were violated in 1995, under the welfare reform act and family violence act that protects victims under the welfare reform act.  And then Plaintiffs, Kloth-Zanard and Zanard had their constitutional rights violated again in 1997 when they were falsely placed on the abuse and neglect registry despite exoneration by a Danbury Juvenile Court Judge.  And were never formally notified of this placement on the list in 1997 so that they could immediately have it removed.  Instead, the Plaintiffs spent the next 15 years wondering why they could never get gainful employment despite extensive education training and skills.

## AMENDED COMPLAINT TO INCLUDE BUT NOT LIMITED TO THE FOLLOWING:

2)  Extensive ADA Violations including TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. §§ 12131-12134, SECTION 504 OF THE REHABILITATION ACT OF 1973 (SECTION 504), 29 U.S.C. § 794, SECTION 28 CFR § 35 & 36 FROM THE DOJ OF THE UNITED STATES OF AMERICA

3)  Danbury Department of Children and Families is not protected by Sovereign immunity, as it is a municipality owned/run agency. Jabbar COLLINS, Plaintiff,  v.  The CITY OF NEW YORK, 923 F.Supp.2d 462 (2013).  Department of Social Services is not protected by Sovereign immunity, as it is a municipality

owned/run agency. Jabbar COLLINS, Plaintiff, v. The CITY OF NEW YORK, 923 F.Supp.2d 462 (2013)

a) Suits for prospective relief are not barred, id., and Eleventh Amendment immunity does not extend to a suit against a state official in their individual capacity, even when the conduct complained of was carried out in accordance with state law. Ford v. Reynolds, 316 F.3d 351, 356 (2d Cir.2003). McFarlane v Roberta, 891 F.Supp.2d 275 (D. Conn 2012)

  i) Municipal entities do not enjoy absolute immunity under the Eleventh Amendment. For example, tt appears that the case of the Department of Social Services for the City of Baltimore is not a state agency, but rather, is a municipal entity.[13] And that municipal entities are liable under §1983 only if "action pursuant to official municipal policy of some nature caused a constitutional tort." Much of the sovereign immunity of the United States was swept away in 1946 with passage of the FTCA, which renders the Government liable "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United Page 481 U S 693, 28 U.S.C. § 1346(b) Read as it is written, this language renders the United States liable to all persons, including servicemen, injured by the negligence of Government employees and Monell v. New York Dep't of Social Service , 436 U.S. 658, 691, 98 S. CT. 2018, 2036, 56 L.Ed 2d 611 (1978).

ii) Constitutional Tort would be fiduciary responsibility to legally notify about the placement of their names on the Abuse and Neglect Registry as well as the removal once the judge dismissed the charges.

iii) Constitutional torts are violation of one's constitutional rights by a government servant. Constitutional tort actions are brought under 42 USCS § 1983 against government employees seeking damages for the violation of federal constitutional right, particularly those arising under the Fourteenth Amendment and the Bill of Rights.

iv) 42 USCS § 1983 reads as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the U.S. or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

## PARTIES

4) Plaintiffs Joan T. Kloth-Zanard and Christopher Zanard are citizens and residents of the state of Connecticut.

5) Defendants Governor Dannel Malloy, Joette Katz, Commissioner of Department of
   Children and Families, Danbury Department of Children and Families, Roderick L.
   Bremby, Commissioner of the Dept. of Social Services (DSS) and the following
   agents of the Department of Children and Family in the order found in the DCF
   records: Christine Lupke, Jean Norvig, & Carl Graham-Leichner are or were
   employees of the state of Connecticut's Department of Social Services and
   Department of Children and Family Services.  The caseworkers for the Department of
   Social Services involved in 1995 cannot be listed as the State of Connecticut cannot
   produce the records with their names, thus the plaintiffs can only include DSS and
   Governor Malloy in this case.


## JURISDICTION AND VENUE

6) The amount of the controversy exceeds $75,000

7) The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
   1331, 1332.

8) Venue is proper in this district pursuant to 28 U.S.C § 1391.

9) Plaintiff's filed a suit and requested permission to sue back in July 2012 with the
   Claims Commissioner.

   a) Under General Statutes Chapter 53, the Claims Commissioner has only 90 days
      within which to respond.

   b) Plaintiff's repeatedly emailed and called asking about the status of this request
      and were told for 2.5 years that it was "sitting on the commissioners desk" by his
      clerk, Tara Dupont and Erica Searles(Unsure of last name).

c)  On the following dates, Plaintiff's repeatedly contacted the Claims Commissioner
and Commissioner Katz, Commissioner Brembly and others as to the status of this
request to sue DSS and DCF.

i)  August 2, 2012, Letter

ii)  On or About July 12, 2013, Phone call

iii)  August 1,2014, Letter

iv)  October 20, 2014 series of emails including a response from Tara stating it is
still pending with no decision having been rendered.

v)  October 21, 2014, after finding out about General Statute pertaining to the
Claims Commissioner, Plaintiff's letter cites General Statute Chapter 53.

d)  Claim Commissioner's refusal to respond within the 90 Days allotted by General
Statute Chapter 53 shows that they were out of time limit to respond and thus
gave up their right to make any decision as to the validity of this suit, and thus
their right to have a voice in this matter.

10) Jurisdiction of this matter finds that Rooker–Feldman, which is a limited doctrine
aimed at preventing "cases brought by state-court losers complaining of injuries
caused by state-court judgments rendered before the district court proceedings
commenced and inviting district court review of those judgments," is not applicable
based on the four prongs used to test for jurisdiction in state contested matters.  Prong
1:The plaintiffs are NOT losers in a case initiated by the state for false neglect
charges.  In fact, the plaintiffs were winners but yet were further harassed and
defamed by DCF when it continued to put them on the Abuse and Neglect Registry
despite clear instructions from the Judge that they were to dismiss, withdraw and the

case was clearly filed as unsubstantiated.  In fact, the judge was furious with DCF for filing the false neglect charges and not originally doing their job properly.  The judge charged DCF informally with neglect.  Prong 2: Plaintiffs were not harmed by the Juvenile court decision but instead rewarded it.  It was the defendant's negligent actions that caused the harm.  Prong 3: The plaintiff's had no need to ever invite the district court to review the lower Juvenile Courts decision as it was already in their favor.  Prong 4:  As the Juvenile Court's decision was in the Plaintiff's favor, no district court was ever brought in to contest it.  Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283–4, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Second Circuit has adopted a four-part test for determining whether Rooker–Feldman strips jurisdiction:

11) Rooker–Feldman directs federal courts to abstain from considering claims when four requirements are met: (1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced. McKithen v. Brown, 626 F.3d 143, 154 (2d Cir.2010). DCF and the Social Workers contend that, because Ms. McFarlane is seeking only a reversal of the state juvenile court judgment, she falls well within the bounds of Rooker–Feldman. See Defendant's Memorandum of Law in Support of Motion to Dismiss Amended Complaint ("Memo. Supp. Mot. Dismiss Am. Compl.") (Doc. No. 29–1) at 7–10.

12) Defendants intentionally omitted information about the plaintiff's rights in 1995 and then subsequently falsely placed their names on the abuse and neglect registry.

Plaintiff Kloth-Zanard began to discover these intentional omissions and committed acts by accident when a false lien was placed on her home by DSS related to the time period of 1995-1998.

13) Plaintiffs did not actually discover about the placement on the Abuse and Neglect Registry until about June 2012, and thus this is when the Statute of Limitations began for the filing of the DCF complaint.

   a)  This accidental disclosure in 2012 resulted in a timely and diligent research on Plaintiff Kloth-Zanard's part related to the potential harm from this omitted information, thus tolling the statue of limitations.

## FACTUAL BACKGROUND

14) In 1995, Plaintiff, Kloth-Zanard was denied her educational rights by DSS under the Welfare Reform Act and Family Violence Laws.

   a)  Plaintiff came to this state to finish the last 18 months of her education for Physical Therapy at Sacred Heart.  Under the Welfare Reform Act, the purpose was to help parents become self-sufficient via job training and education.  As a victim of Domestic Violence, Kloth-Zanard was listed as a separate class under Welfare Reform and allotted extra time to complete her educational endeavors. While Kloth-Zanard had been enrolled in a timely manner starting January 1995, she had a housing issue and DSS told her to put her education on hold until September so she could get her housing situation stabilize.  When September came around, she reenrolled in school but was threatened by DSS with loss of her Section VIII housing, food stamps and energy assistance if she attended school. . Kloth-Zanard never received any cash assistance that she knows of or can recall.

But had she been allowed to attend college, cash assistance via grants, funding and other sources would have been additionally available to her along with day care and medical care through the university's programs. DSS's action deprived Plaintiff, Kloth-Zanard from becoming self-sufficient and impeded her constitutional right to an education.

b)  Kloth-Zanard would have had cash assistance, day care and medical care through her university. DSS's action deprived Plaintiff, Kloth-Zanard from becoming self-sufficient and impeded her constitutional right to an education. But in no way is Plaintiff stating that she received Cash Assistance in the amount claimed by the state or DSS.

c)  Summary of Family Violence Laws by Sandra Norman-Eady, October 2, 2009, 2009-R-0349 An Act Concerning Welfare Reform and The Expenditures Of The Department of Social Services (PA 97-2, June 18 Special Session) The act exempts Temporary Family Assistance applicants and recipients who are victims of family violence from job training, work placement assistance, subsidized and unsubsidized employment, and child support enforcement requirements. It defines a domestic violence victim as someone who has been battered or subjected to extreme cruelty by (1) physical acts that resulted in, or threatened to result in, physical injury; (2) sexual abuse; (3) sexual activity involving a child in the home; (4) being forced to participate in sexual acts; (5) mental abuse; or (6) neglect or medical care deprivation.

15) In 1996, a central registry for Abuse and Neglect was created. Under the rules and procedures associated with   CONN. GEN. STAT. §17a-28 and §17a-101   REG.

CONN. STATE AGENCIES §17a-101-1 through §17a-101-10 Access to the Central Registry shall be limited to duly authorized Department employees for purposes of obtaining information for the investigation of child abuse and neglect, background checks, and other uses permitted by law. Prospective employers or licensing authorities are permitted to request background checks for any person, provided they submit a release signed by the subject of the background check. The Connecticut Departments of Public Health and Social Services may request background checks without signed releases pursuant to state statute. Legal References: Conn. Gen. Stat. §17a-28(f) and §17a101k(b).

a) In other words, if the Plaintiff signed off giving a prospective employer the right to run a background check, then they would have access to this information on the Registry.

b) As plaintiff's were unaware that they were on the Abuse and Neglect Registry, they complied with all their prospective employers requests and signed a statement to allow background checks.

c) Thus the placement of the Plaintiffs on the Abuse and Neglect Registry directly affected their ability to be gainfully employed, whether with a state agency or outside of it.

16) DCF records and court records show that on November 18, 1997, all charges of supposed neglect against the plaintiff, Joan Kloth-Zanard were dismissed and unsubstantiated. No charges were ever brought against, Plaintiff, Christopher Zanard for neglect. Yet, DCF falsely put the plaintiff's names on the Abuse and Neglect Registry in 1997.

17) Plaintiffs files show that there were no substantiated charges and that any and all the case against were dismissed.

18) This is repeated again in plaintiff Kloth-Zanard's file in February 1998.   Nowhere in their files does it show a formal letter was sent to the plaintiff's that they were being put in the abuse and neglect registry so that they could have their names removed.

   i)   At the time of the initial incident, Plaintiff was under extreme duress and stress. Anything verbally spoken to her would not be legally admissible due to her state of mind.

19) Furthermore, the plaintiff would not have known to have their names removed, as they were never formally appraised that their names were put on the registry.

20) By law, if there are no substantiated charges, their names cannot be placed on the registry or had to be immediately removed.

21) Criteria for Registry Placement By law, the DCF commissioner must maintain a central child abuse and neglect registry. The commissioner cannot enter a name on the registry until after the department has investigated a report of alleged abuse or neglect and found (1) reasonable cause to believe that the abuse or neglect has in fact occurred (substantiation) and (2) made a "recommended finding" in this regard. Additionally, the commissioner must determine whether an identifiable person (1) is responsible for the abuse or neglect and (2) poses a risk to the child's health, safety, or well-being and should therefore have his or her name placed on the registry. CGS§17a-101g.

22) DCF was well aware that there were no substantiated charges, yet continued to leave their names on this registry. This action caused the plaintiffs to be unable to retain gainful employment.

23) For 15 years or more the plaintiffs could not understand why they could not get employment and were constantly turned down until Plaintiff Kloth-Zanard applied for a volunteer job with CASA CIP who notified her by mail of the registry issue.

24) While the plaintiff's have gotten their names removed, the damages have been done as they have lost their primary years of employment and work history as well as forced them onto states assistance, such as Medicaid, SNAP, energy assistance, food bank and Mobile Food Bank.

25) Numerous State and Federal Courts have declared the Registry is unconstitutional: 18 F.3d 992 (1994), Anna VALMONTE, Individually, and on behalf of all others similarly situated, Plaintiff-Appellant, v. Mary Jo BANE, As Commissioner of the NYS Dept. of Social Services, J. Daniel Bloomer, As acting Commissioner of the Orange County Dept. of Social Services, Defendants-Appellees. United States Court of Appeals, Second Circuit. Argued September 2, 1993. Decided March 3, 1994.


## COURTS CLAIM OF SOVEREIGN IMMUNITY

26) The plaintiff's now addresses the State's claim of Sovereign Immunity. The plaintiff's feel this is moot based on the following case precedents and Plaintiff, Kloth-Zanard's ADA Rights.

   a) Our founding fathers did not mean the Eleventh Amendment to allow states to be immune from prosecution because it opened up a door that would allow the states

to do as they please. From the Article by Mark Strasser: "Chishom, The Eleventh Amendment, and Sovereign Immunity: On Alden's Return to Confederation Principles". In this article it is cited that Alexander Hamilton, James Madison as well as many other argued that the Interpretation of the Eleventh Amendment has been taken out of context and can be too easily abused by the states.

27) John Marshall argued that federal courts would have to have jurisdiction over issues involving the Constitution and federal laws. He suggested this both in Cohen's and also in the ratification debates. He, like the other Framers, understood that the consequences of allowing states to plead sovereign immunity when violating federal law or abridging individual rights under the Constitution would be too "mischievous" to be tolerated.

28) The current Court claims to base its robust state sovereign immunity view on the intentions of the Framers. Yet, the Framers had just experienced the consequences of having a weak central government where states might put their own perceived interests over the interests of the nation as a whole. The Framers understood what the Court apparently does not: unless states can be forced to appear in federal court, they will violate federal law and subvert national interests with impunity, whether directly or indirectly. The Courts current interpretation of state sovereign immunity does not comport with the language of the Constitution, the Framers' intentions, or a policy likely to promote the interests of the nation as a whole, and must be corrected at the first opportunity.

   a) As to the Eleventh Amendment, it speaks specifically that non-citizens of a state

cannot sue that state.  As the Plaintiff's are citizens of the state of CT, they are not barred according to the Eleventh Amendment.

b)  It is widely felt by the Supreme Court, Judges and attorneys that the Eleventh Amendment is unconstitutional and poorly written.  Harvard Law Review, The Eleventh Amendment and the Nature of the Union by Bradford Clark, Volume123, une 2010, Number 8.

c)  In fact, the Abrogation doctrine, which the Eleventh Amendment is based around, is a constitutional law doctrine expounding when and how the Congress may waive a state's sovereign immunity and subject it to lawsuits to which the state has not consented (i.e., to "abrogate" their immunity to such suits).  *In Seminole Tribe v. Florida, 517 U.S. 44 (1996) the Supreme Court ruled that the Congress's authority, under Article One of the United States Constitution, could not be used to abrogate state sovereign immunity.[1] However, the Congress can authorize lawsuits seeking monetary damages against individual U.S. states when it acts pursuant to powers delegated to it by amendments subsequent to the Eleventh Amendment. This is most frequently done pursuant to Section 5 of the Fourteenth Amendment, which explicitly allows the Congress to enforce its guarantees on the states and thus overrides states' Eleventh Amendment immunity.  *The doctrine was first announced by the Supreme Court in a unanimous decision written by then-Associate Justice William Rehnquist, Fitzpatrick v. Bitzer, 427 U.S. 445 (1976). Bitzer "continued the line of reasoning that Rehnquist had acknowledged in Fry v. United States ... that cases involving Congress' authority under Section 5 present different problems than cases involving the Congress's Commerce Clause

authority."[2] The doctrine has since developed a number of nuances and limitations. In particular, later cases explained that the Court would not infer Congressional intent to abrogate sovereign immunity, but would only uphold arrogations where the Congress has "unequivocally express[ed] its intention to abrogate the Eleventh Amendment bar to suits against states in federal court." In order to do this, the Congress must "mak[e] its intention unmistakably clear in the language of the statute." Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985).

d) Another limitation that the courts have read into Congressional power to abrogate is the "congruence and proportionality" test, first discussed in City of Boerne v. Flores, 521 U.S. 507 (1997). Because the Fourteenth Amendment allows Congress to take "appropriate" action to enforce rights, the Court has determined that such action must be congruent and proportional to the deprivation of the right that the Congress is seeking to remedy. An example of a case where an act of the Congress failed the Boerne test is Kimel v. Florida Board of Regents, 528 U.S. 62 (2000). An example where an act passed the Boerne test is Nevada Department of Human Resources v. Hibbs, 538 U.S. 721 (2003).Alexander Chisholm v. Georgia, 2 U.S. 419 (1793), is considered the first United States Supreme Court case of significance and with impact related to the Eleventh Amendment. Given its date, there was little available legal precedent (particularly in American law).[1] It was almost immediately superseded by the Eleventh Amendment.

29) Article III, Section 2's grant of federal jurisdiction over suits "between a State and Citizens of another State" abrogated the States' sovereign immunity and granted

federal courts the affirmative power to hear disputes between private citizens and States.

30) Citizens of one state or of foreign countries can still use the federal courts if the state consents to be sued, or if Congress, pursuant to a valid exercise of Fourteenth Amendment remedial powers, abrogates the states' immunity from suit. See Fitzpatrick v. Bitzer, 427 U.S. 445 (1976).

    a) The Court ruled that Congress has the power under the Fourteenth Amendment to abrogate sovereign immunity of states, because the Fourteenth Amendment was enacted specifically to limit the power of the states, with the purpose of enforcing civil rights guarantees against them.

    b) Furthermore, a federal judge in Tallahassee, Florida, Judge Maurice Paul granted the motion for opening the following case against FL state agencies. This case opens the door to impede the state's claims of sovereign immunity.

        i) The ruling resulted from a lawsuit by the Florida Teaching Profession-National Education Association (FTP-NEA) on behalf of three educators and the entire class of 211,000 persons listed on the "indicated" category of the abuse registry computer. Judge Paul's October, 1990 ruling opened the door for 211,000 lawsuits against the Florida Department of Health and Rehabilitative Services (H.R.S.)  The Florida Legislature, during the spring, 1991 session, removed the "indicated-perpetrator unknown" classification from state law books in order to avoid substantial litigation costs.

    c) Furthermore, under the Rehabilitation Act and involved in several of the cases listed below, if a state's agency receives Federal Funding, they forfeit sovereign

immunity.  DCF receives Federal Funding.  "Court invalidated the abrogation of

sovereign immunity in several civil rights statutes.  Nevertheless, as explained

below, the Court upheld the abrogation of sovereign immunity in later cases

involving other statutory provisions.  Moreover, an alternative approach

authorizing damages which is utilized in the Rehabilitation Act -- tying the waiver

of sovereign immunity to the receipt of federal funds -- has to date been very

successful in many federal courts of appeals" in other words accepted.  Rochelle

Bobroff & Harper Jean Tobin, Strings Attached: The Power of the Federal Purse

Waives State Sovereign Immunity for the Rehabilitation Act, 42 Clearinghouse

Review 16 (May-June 2008).

d)  State law gives state officials and employees immunity from liability when

discharging their duties and acting within the scope of their employment. But they

are not immune from liability for wanton, reckless, or malicious acts such as

falsely placing a person or persons on the Abuse and Neglect Registry or not

removing them from said registry, when a judge has determined that there is no

substantiated charges.  In fact, in the case for this Plaintiff's, the judge held that

DCF was the one who was in Neglect.  (DCF vs. Kloth, 1997, Danbury Juvenile

Court   Case No. unknown as Juvenile court will not release and plaintiffs cannot

afford the cost of this transcript and information )

e)  By statute, state employees and officers are not liable for damage or injury that is

caused within the scope of their employment or by the discharge of their DUTIES

AS LONG AS THEY ARE NOT WANTON, RECKLESS, OR

MALICIOUS(CGS § 4-165).  The DCF workers actions were deliberate done on

purpose as they were clearly told by the Judge on November 18, 1997 and in subsequent follow-ups with this judge, that charges were dismissed and that they were the ones in neglect.

31) Per § 2000d–7 of the Civil rights remedies equalization (a) General provision (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance. (2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State. (b) Effective date The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or in part after October 21, 1986   (Pub. L. 99–506, title X, §1003, Oct. 21, 1986, 100 Stat. 1845.)

32) There is no immunity for the state or it agencies under federal civil rights law for Defamation, Slander, Perjury, Due Process rights or any other acts that cause undue harm to another.

33) To remedy violations of these federal laws, an aggrieved individual may seek relief from states and/or state officials.  (http://federalpracticemanual.org/node/47#1, Rochelle Bobroff)

a) Cases have reaffirmed the availability of injunctive relief against state officials for violations of safety net and civil rights statutes.  See Rochelle Bobroff, Ex Parte Young as a Tool to Enforce Safety Net and Civil Rights Statutes, 40 Univ. of Toledo L. Rev. 819 (2009).

34) The Court upheld the abrogation of sovereign immunity in later cases involving other statutory provisions.  See Rochelle Bobroff, Scorched Earth and Fertile Ground: The Landscape of Suits Against the States to Enforce the ADA, 41 Clearinghouse Review 298 (Sept.–Oct. 2007). See also Harper Jean Tobin, The Genetic Information Nondiscrimination Act of 2008: A Case Study of the Need for Better Congressional Responses to Federalism Jurisprudence, 35 J. of Legis. 113 (2009).

35) Moreover, an alternative approach authorizing damages which is utilized in the Rehabilitation Act -- tying the waiver of sovereign immunity to the receipt of federal funds -- has to date accepted.  Rochelle Bobroff & Harper Jean Tobin, Strings Attached: The Power of the Federal Purse Waives State Sovereign Immunity for the Rehabilitation Act, 42 Clearinghouse Review 16 (May-June 2008).

a) State officials may be sued for damages in their individual capacity for violations of federal constitutional or statutory rights committed in the course of official duties but maybe entitled to claim qualified immunity.  The Fourth Circuit held in Lizzi v. Alexander, 255 F.3d 128, 137-38 (4th Cir. 2001), cert. denied sub nom. Lizzi v. Washington Metropolitan Area Transit Authority, 534 U.S. 1081, reh'g denied, 535 U.S. 952 (2002), that individual capacity suits against state officials arising out of official acts may be limited to suits under 42 U.S.C. § 1983, and not to liability arising under other federal statutes, even though the statute specifically

makes the state official liable. Without explanation, the court held that such suits are in fact against the state. Presumably, the court expected the state to indemnify the official for any liability.

b) As DCF was well aware of our statutory rights and the finding by a judge that there was no substantiation of their neglect claims, qualified immunity is not barred from recovery as the official's conduct did "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (emphasis added). See Robert Capistrano, Using Section 1983 to Raise Constitutional Claims in Garden-Variety Cases, 38 Clearinghouse Review 734, 741 (March-April 2005).

c) Congress has power to abrogate state sovereign immunity when it does so unequivocally and pursuant to a grant of constitutional authority. If the abrogation is constitutionally valid, states may be sued in federal court in their own name for violations of relevant statutes to which the abrogation applies, and plaintiffs may recover damages from states if the underlying statute so provides. (Kimel v. Florida Board of Regents, 528 U.S. 62, 73-74 (2000) (holding that congressional intent to abrogate state sovereign immunity is clearly expressed when a statute, by its plain terms, applies to state actors). See Bobroff, Scorched Earth, supra note 10; Tobin, supra note 10

d) There are three ways that states waive their immunity: (1) by state legislation explicitly waiving immunity from suit; (2) by accepting federal funds that have been provided on the condition that sovereign immunity is waived; and (3) by removing state court litigation to federal court.

36) Many federal programs, including cash assistance, medical insurance, food stamps, and housing, are implemented through grants to the states. The states are responsible for the administration of these programs and are required to operate them in compliance with federal law. Frew v. Hawkins, 540 U.S. 431, 433 (2004). See Dalton v. Little Rock Family Planning Services, 516 U.S. 474, 476 (1996). Beneficiaries may have a claim in federal court if a state violates a federal directive in the administration or denial of benefits. Also, in Rosie D. v. Swift, 310 F.3d 230, 237 (1st Cir. 2002). Accord Westside Mothers v. Haveman, 289 F.3d 852, 862 (6th Cir. 2002); Antrican v. Odom, 290 F.3d 178, 190 (4th Cir. 2002).

    a) See also Reynolds v. Giuliani, 118 F. Supp. 2d 352, 382 (S.D.N.Y. 2000) (holding that remedial scheme for both Food Stamps and Medicaid does not preclude relief under Ex parte Young) Missouri Child Care Association v. Cross, 294 F.3d 1034, 1038-39 (8th Cir. 2002). Accord Joseph A. v. Ingram, 275 F.3d 1253 (10th Cir. 2002), again he Eighth Circuit reached the same conclusion regarding the Child Welfare Act, holding that its remedial scheme was not similar to that at issue in Seminole Tribe.

    b) See also, Miranda B. v. Kitzhaber, 328 F.3d 1181, 1188 (9th Cir. 2003). In the context of Title II of the Americans with Disabilities Act, the Ninth Circuit rejected arguments that the Eleventh Amendment prohibits prospective relief, finding that the remedial scheme of the Americans with Disabilities Act was similar to that in Verizon.

37) Looking at Coeur d'Alene, while states have argued that special sovereign interests provide prospective relief from the enforcement of safety net and civil rights statutes,

this argument has been soundly rejected.  In a Medicaid case, the Tenth Circuit

explained that the "state's interest in administering a welfare program at least

partially funded by the federal government is not such a core sovereign interest as to

preclude the application of Ex parte Young."  Lewis v. New Mexico Department of

Health, 261 F.3d 970, 978 (10th Cir. 2001). Accord Antrican, 290 F.3d at 190

(Medicaid); Oklahoma Chapter of the American Academy of Pediatrics v. Fogarty,

205 F. Supp. 2d 1265 (N.D. Okla. 2002) (Medicaid); Office of the Child Advocate v.

Lindgren, 296 F. Supp. 2d 178 (D.R.I. 2004) (child welfare system).

a)   In addition, in Ex parte Young, see Indiana Protection and Advocacy Services v.

Indiana Family and Social Services Administration, 603 F.3d 365, 370-74 (7th

Cir. 2010) (en banc). The Supreme Court of New Mexico, holding Ex parte

Young applicable in state court, reached the same result, concluding that the Age

Discrimination in Employment Act did not implicate special sovereignty interests

akin to those found in Coeur d'Alene.  Gill v. Public Employees Retirement

Board, 90 P.3d 491, 500, 501 (N.M. 2004).

b)   The Supreme Court confirmed, in South Dakota v. Dole, that "Congress may

impose conditions on states in exchange for the provision of federal funds, South

Dakota v. Dole, 483 U.S. 203 (1987) (upholding requirement that states raise the

minimum drinking age to 21 as a condition on the receipt of federal highway

funds); Fullilove v. Klutznick, 448 U.S. 448.

(http://federalpracticemanual.org/node/47#1).

38) Citing Dole, the Court recently stated, "Congress has broad power to set the terms on which it disburses federal money to the States." Arlington Central School District Board of Education v. Murphy, 548 U.S. 291, 295-96 (2006)

39) Congress may require that the states waive their sovereign immunity as a condition of receiving federal funds. Sossamon v. Texas, 131 S. Ct. 1651, 1657-58 (2011). Atascadero State Hospital v. Scanlon, 473 U.S. 234, 246-47 (1985)

    a) Although expressed in terms of abrogation, Section 2000d-7 applies to the states as a waiver of immunity arising from a state accepting federal funds. If sovereign immunity is waived under statutes enacted as part of the spending power, a private plaintiff may sue the state or state agency as a named defendant and may recover damages to the extent that they are allowed by the underlying statute; the private plaintiff also may obtain injunctive and other relief.

    b) Laws that waive sovereign immunity based on the acceptance of federal funds have a wide applicability. Because most state agencies receive some federal funds, it is generally not difficult to establish the state's acceptance of federal assistance. Bobroff & Tobin, supra note 11, at 24-25. The Rehabilitation Act, in particular, provides that if one part of a department or agency receives federal financial assistance, the entire entity is considered to receive federal assistance and must conform to the Act's requirements. Rehabilitation Act, 29 U.S.C.A. § 794(b); see, e.g., Schroeder v. City of Chicago, 927 F.2d 957, 962 (7th Cir. 1991). See also the federal implementing regulations for Section 2000d-7, 70 Fed. Reg. 24314-22 (May 9, 2005) (final regulations) (amending the regulations governing nondiscrimination on the basis of race, color, national origin, handicap, sex, and

age to conform to the Civil Rights Restoration Act of 1987). Even state agencies that merely distribute federal assistance are covered by the Rehabilitation Act. Rehabilitation Act, 29 U.S.C. § 794(b)(1)(B)

40) Furthermore, the following cases overrule the Eleventh Amendment:

   a) Michelle Mammaro v. Department Children & Families, Division of Child Protection and Permanency (DYFS) et.al.  January 2015.  The Federal District Court in Trenton ruled that these state employees are not immune from suit for conduct in violation of the constitution rights of parents, and Mammaro has won the right to sue department heads and individual employees of the state Department of Children & Families, its Division of Child Protection and Permanency (then the Division of Youth and Family Services, DYFS) and the Watchung Police Department, Kenneth Rosellini of Clifton said in a press release http://www.nj.com/warrenreporter/index_ssf/2015/01/state_takes_child_from_home_in.html

   b) Ford Motor Co. v. Department of Treasury, 323 U.S. 459 (1945)

   c) Where relief is sought under general law from wrongful acts of state officials, the sovereign's immunity under the Eleventh Amendment does not extend to wrongful individual action, and the citizen is allowed a remedy against the wrongdoer personally. Atchison, T. & S.F Ry. Co. v. O'Connor, 223 U.S. 280, 32 S.Ct. 216, 56 L.Ed. 436, Ann.Cas 1913C, 1050; cf. Matthews v. Rodgers, 284 U.S. 521, 528, 52 S.Ct. 217, 220, 76 L.Ed. 447.

   d) Lapides v. Board of Regents of University System of Georgia, 535 U.S. 613 (2002)

e) Parden v. Terminal Railroad Co. of Alabama Docks Department, 377 U.S. 184
   (1964)

f) Welch v. Texas Department of Highways & Transportation, 483 U.S. 468 (1987)

g) Parden v. Terminal Railroad Co. of Alabama Docks Department, 377 U.S. 184
   (1964)

h) College Savings Bank v. Florida Prepaid Postsecondary Education Expense
   Board, 527 U.S. 666 (1999)Shapiro v. Thompson, 394 U.S. 618 (1969)

i) State Department of Health & Rehabilitation Services. v Zarate, 407 U.S. 918
   (1972)

j) Sterrett v. Mothers' & Children's Rights Organization, 409 U.S. 809 (1973)

k) Wyman v. Bowens, 397 U.S. 49 (1970)

l) Edelman v. Jordan, 415 U.S 651 (1974)?

m) Pennsylvania v. Union Gas Co., 491 U.S. 1 (1989)

n) Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1997)

41) In addition, in Frazar v. Gilbert, 300 F.3d 530 ( 5th Cir.2002) it was also determined
that the state of Texas's claim of sovereign immunity was not upheld.

   a) A class action suit on behalf of indigent children in Texas was filed against the
   Texas Health and Human Services Commissioner and others claiming the
   children received inadequate health care under a federally mandated program. The
   suit was settled through a consent decree that laid out detailed procedures for
   Texas health officials to follow to meet federal guidelines. Later, Linda Frew and
   other parents complained that these obligations were not being met. The court
   ruled that the state must present an action plan for remedying violations of the

consent decree. In response, state officials contended the health care program had improved substantially and appealed to the Fifth Circuit, claiming immunity from enforcement of the decree under the Eleventh Amendment. The Fifth Circuit agreed that the Eleventh Amendment barred enforcement of the consent decree, even though state health officials had previously agreed to it. The Supreme Court agreed to review two questions: 1) Whether states implicitly forfeit Eleventh Amendment rights when they enter into a court-approved consent decree based on federal law that requires ongoing judicial supervision, and 2) Whether in order for a district court to enforce a consent decree, the violations must also be violations of federal rights. It appears that the Supreme Court also agreed that the state and it's employees forfeited their sovereign immunity rights.

## COUNT 1: VIOLATION OF ADA RIGHTS:

## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. §§ 12131-12134, SECTION 504 OF THE REHABILITATION ACT OF 1973 (SECTION 504), 29 U.S.C. § 794, SECTION 28 CFR § 35 & 36 FROM THE DOJ OF THE UNITED STATES OF AMERICA

1) Plaintiff, Kloth-Zanard's ADA rights were violated beginning in 1995 and continue to be disregarded and ignored by the Defendants under Title II of the Americans with Disability Act. The ADA applies to State and local government entities. Subtitle A of the ADA, protects qualified individuals with disabilities from discrimination, on the basis of disability, and from services, programs, and activities that are provided by State and local government entities. Title II extends the prohibition on discrimination

established by section 504 of the Rehabilitation Act of 1973, and as amended in 29 U.S.C. 794, to all activities of State and local governments regardless of whether these entities receive Federal financial assistance.  Furthermore, Tittle II brings in the 14th Amendment Rights against discrimination.  Additional to this is the DOJ's ADA effectuated 28-CFR-section 35.104-107b and section 36.104-107. that further protects the disabled.  According to the ADA in Fed Court, The principles' of both Section 504 of the Rehabilitation Act and the ADA are fully applicable thru the Bill of Rights, basically via equal Protection, Due Process, rights to life, liberty, property and happiness.

a) The plaintiff contends that Affirmative Action which is covered under the Americans with Disability Act (ADA) of 1990 was meant to break down barriers, both visible and invisible, to level the playing field, and to make sure everyone is given an equal break. They are not meant to guarantee equal results -- but instead proceed on the common-sense notion that if equality of opportunity were a reality, African Americans, women, people with disabilities and other groups facing discrimination would be fairly represented.

b) Congress determined that "(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

c) Congress then set forth prohibitions against discrimination in employment (Title I, §§12111-12117), public services furnished by governmental entities (Title II, §§12131-12165), and public accommodations provided by private entities (Title

III, §§12181-12189). The statute as a whole is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." §12101(b)(1).

d) Title II's definition section states that "public entity" includes "any State or local government," and "any department, agency, [or] special purpose district." §§12131(1)(A), (B). The same section defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." §12131(2).

e) Per the UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, August Term, 2003, (Argued October 7, 2003 Decided April 7,2004), Docket No. 02-9385, MARIE POWELL v. NATIONAL BOARD OF MEDICAL EXAMINERS, UNIVERSITY OF CONNECTICUT SCHOOL OF MEDICINE, BRUCE M. KOEPPEN, Before: WALKER, Chief Judges NEWMAN, and CARDAMONE, Circuit Judges. In order for a plaintiff to establish a prima facie violation under these Acts, she must demonstrate (1) that she is a "qualified individual" with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her disabilit[y]." Id. Plaintiff Kloth-Zanard intends to present and prove this to be factual.

f) On redress for violations of §12132's discrimination prohibition, Congress referred to remedies available under §505 of the Rehabilitation Act of 1973, 92 Stat. 2982, 29 U. S. C. §794a  See 42 U. S. C. §12133 ("The remedies, procedures, and rights set forth in [§505 of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").

g) Congress instructed the Attorney General to issue regulations implementing provisions of Title II, including §12132's discrimination proscription. See §12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part.").   The Attorney General's regulations, Congress further directed, "shall be consistent with this chapter and with the coordination regulations . . . applicable to recipients of Federal financial assistance under [§504 of the Rehabilitation Act]." 42 U. S. C. §12134(b). One of the §504 regulations requires recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 CFR §41.51(d) (1998), 28 CF §36.202

h) As Congress instructed, the Attorney General issued Title II regulations, see 28 CFR pt. 35 (1998) and Section 36, including one modeled on the §504 regulation just quoted; called the "integration regulation," it reads: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR §35.130(d) (1998) and §36 203 .

i)   The preamble to the Attorney General's Title II regulations defines "the most
     integrated setting appropriate to the needs of qualified individuals with
     disabilities" to mean "a setting that enables individuals with disabilities to interact
     with non-disabled persons to the fullest extent possible." 28 CFR pt. 35, App A,
     p 450 (1998) and Section 36. Another regulation requires public entities to "make
     reasonable modifications" to avoid "discrimination on the basis of disability,"
     unless those modifications would entail a "fundamenta[l] alter[ation]"; called here
     the "reasonable-modifications regulation," it provides:

j)   "A public entity shall make reasonable modifications in policies, practices, or
     procedures when the modifications are necessary to avoid discrimination on the
     basis of disability, unless the public entity can demonstrate that making the
     modifications would fundamentally alter the nature of the service, program, or
     activity." 28 CFR §35.130(b)(7) (1998) and §36 302.

k)   The ADA stepped up earlier measures to secure opportunities for people with
     developmental disabilities to enjoy the benefits of community living. The
     Developmentally Disabled Assistance and Bill of Rights Act (DDABRA), a 1975
     measure, stated in aspirational terms that "[t]he treatment, services, and
     habilitation for a person with developmental disabilities . . . *should be* provided in
     the setting that is least restrictive of the person's personal liberty " 89 Stat. 502, 42
     U. S. C. §6010(2) (1976 ed.) (emphasis added); see also *Pennhurst State School
     and Hospital* v. *Halderman,* (1981) (concluding that the §6010
     provisions of the DDABRA "were intended to be hortatory, not mandatory"). In a
     related legislative endeavor, the Rehabilitation Act of 1973, Congress used

mandatory language to proscribe discrimination against persons with disabilities. See 87 Stat. 394, as amended, 29 U. S. C  §794 (1976 ed.) ("No otherwise qualified individual with a disability in the United States . . . *shall* , solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (Emphasis added)). Ultimately, in the ADA, enacted in 1990, Congress not only required all public entities to refrain from discrimination, see 42 U. S. C. §12132, additionally, in findings applicable to the entire statute, Congress explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination." See §12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); §12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including . . . segregation").

l)  28 CFR pt. 35, App  A, p. 450 (1998) and §36.202 ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation.")

m)  Omstead v  LC backs up all of the preceding information pertaining to disability rights and regulations

n)  Viewed in light of the underlying Equal Protection principles, the ADA is appropriate preventive and remedial legislation.  First, it is preventive in that it establishes a statutory scheme that attempts to detect government activities likely tainted by discrimination.  For example, the ADA regulations require States to

conduct self-evaluations of policies, programs, and activities in order to determine

that any distinctions they make based on disability, or refusals to provide

meaningful or integrated access to facilities, programs, and services are based on

legitimate governmental objectives.  The ADA thus attempts to ensure that

inaccurate stereotypes or irrational fear are not the true cause of State

decisions.  See Bangerter v. Orem City Corp., 46 F.3d 1503 & n.20 (10th Cir.

1995); cf. School Bd. of Nassau County v. Arline, 480 U.S. 273, 284-285

(1987).  This approach is similar to the standards articulated by the Court in

Cleburne.

i)   Furthermore, the ADA is remedial in that it attempts to ensure that the

     interests of people with disabilities are taken into account.  Not surprisingly,

     given their profound segregation from the rest of society, see 42 U.S.C.

     12101(a)(2), the needs of persons with disabilities were not considered when

     rules were promulgated, standards were set, and the built environment was

     designed.  As a result, Congress determined that for an entity to treat persons

     with disabilities as it did those without disabilities was not sufficient to

     eliminate the effects of years of segregation and to give persons with

     disabilities equally meaningful access to every aspect of society.  See 42

     U.S.C. 12101(a)(5); see also U.S. Commission on Civil Rights, supra, at

     99.  When persons with disabilities have been segregated, isolated, and denied

     effective participation in society, Congress may conclude that affirmative

     measures are necessary to bring them into the mainstream.  Cf. Fullilove, 448

     U.S. at 477-478.

ii) The ADA thus falls neatly in line with other statutes that have been upheld as valid Section 5 legislation. For when there is evidence of a history of extensive discrimination, as here, Congress may prohibit or require modifications of rules, policies and practices that tend to have a discriminatory effect on a class or individual, regardless of the intent behind those actions. In South Carolina v. Katzenbach, 383 U.S. 301, 325-337 (1966), and again in City of Rome v. United States, 446 U.S. 156, 177 (1980), both cited with approval in City of Boerne, the Supreme Court upheld the constitutionality of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, which prohibits covered jurisdictions from implementing any electoral change that is discriminatory in effect. Similarly, the courts of appeals have unanimously upheld the application of title VII's disparate impact standard to States as a valid exercise of Congress's Section 5 authority. See Grano v Department of Dev., 637 F.2d 1073, 1080 n.6 (6th Cir. 1980) (collecting cases); see also City of Boerne, 117 S. Ct. at 2169 (agreeing that "Congress can prohibit laws with discriminatory effects in order to prevent racial discrimination in violation of the Equal Protection Clause").

iii) In sum, there can be no dispute that "well-cataloged instances of invidious discrimination against the handicapped do exist." Alexander v. Choate, 469 U.S. 287, 295 n.12 (1985). In exercising its broad power under Section 5 to remedy the ongoing effects of past discrimination and prevent present and future discrimination, Congress is afforded "wide latitude." City of Boerne, 117 S. Ct. at 2164. As the Supreme Court reaffirmed in City of Boerne, "[i]t

is for Congress in the first instance to 'determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." Id. at 2172 (quoting Katzenbach, 384 U.S at 651).

o) Plaintiff's ADA rights were violated based on her hidden disabilities under the Americans with Disabilities Act Title II and Section 504. Refusal of the state to provide advocacy and leniency during her fair hearing, shutting down her fair hearing prematurely, not providing various other amenities and modifications as prescribed by law thus shows that the Plaintiff was not afforded her ADA rights under Federal Statutes and Remedies such as The Civil Rights Act of 1964 which prohibits discrimination in public accommodations, facilities and schools and which outlawed discrimination in federally funded projects (P.L. 88-352). Furthermore, once appraised of the Plaintiff's ADA need for accommodation, the state was put on notice to protect her civil rights and ensure a fair hearing and trial as well as be in compliance with Americans with Disability Act and it's additional laws as of January 1992.

p) Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794. Plaintiff, Kloth-Zanard's ADA rights were also violated and continue to be. Title II applies to State and local government entities, and, in subtitle A, protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by State and local government entities. Title II extends the prohibition on discrimination

established by section 504 of the Rehabilitation Act of 1973, as amended, 29

U.S.C. 794, to all activities of State and local governments regardless of whether

these entities receive Federal financial assistance.

q)   In 1995 to present, the plaintiff's hidden disabilities were quite evident and stated

over and over in various documents including her DCF and DSS records.  In fact,

in 1995, it should have been self-evident to DSS that a Single Mother with an 11-

month-old child, who had been a victim of domestic violence, 3 times during her

pregnancy, and had arrived in CT after being homeless for 9 months, would have

hidden disabilities associated with PTSD, Stress and anxiety.  More importantly,

DSS social workers are supposed to be specifically trained to address and deal

with people who have had this kind of trauma in their lives.  Yet, DSS took

advantage of Plaintiff Kloth-Zanard's domestic violence status, duress, stress,

homelessness along with impending new homelessness and single parentage

situation, when in 1995 it first denied her education and threatened to take her

housing, food stamps and energy assistance way without offering any

modification and thus violated began the first of the violation of her rights.

r)   The Supreme Court held in Univ. of Alabama v. Garrett, 531 U.S. 356 (2001),

and determined that the states were held liable for ADA unconstitutionally

discrimination and damages under the employment, educational and other

provisions of the ADA that falls under Title I and Title II of the Americans with

Disabilities Act (ADA).

s)   Under 28 CFR PART 35.104, 105, 106, 107a and 107b, and it's sister Section 36,

DSS and DCF was and still are in non-compliance with the Federal Laws setup to

protect the Disabled.  According to the Department of Justice's 1991 title II ADA regulation published July 26, 1991, and that required compliance by January 26, 1992, it "provided comprehensive civil rights protections to individuals with disabilities in the areas of employment, public accommodations, State and local government services, and telecommunications."

t)   Under Section 35.104 and it's sister section 36, "*1991 Standards* means the requirements set forth in the ADA Standards for Accessible Design, originally published on July 26, 1991," the Plaintiff qualifies and passes all of the tests then and now that qualify her as having not only a hidden disability back then but physical disabilities now plus her hidden disabilities.  Plaintiff Kloth-Zanard is legally disabled on Social Security Disability.

u)   Under Section 35.105 and it's sister setion 36, which "establishes a requirement, based on the section 504 regulations for federally assisted and federally conducted programs, that a public entity evaluate its current policies and practices to identify and correct any that are not consistent with the requirements of this part", by January 26, 1992, The State and it's Agencies had/have a duty to self-evaluate their own forms and procedures to ensure compliance with Title II and 28-CFR-35 and Sister Section 36 by 1992. No where on the forms DSS claims were used in 1995-1998 to apply for assistance and placed into evidence by DSS, does it state or site anything about the rights of the disabled under the ADA, let alone even hint at it.

v)   In Section 35.106 and it's sister section 36, it further states that it "requires a public entity to disseminate sufficient information to applicants, participants,

beneficiaries, and other interested persons to inform them of the rights and
protections afforded by the ADA and this regulation."  No where in any of the
states evidence is this dissemination of information available or prevalent, nor
was it available in 1995-1998.

w) More importantly, under Section 35.107a and 107b and it's sister section 36,, "the
final rule requires that public entities with 15 or more employees designate a
responsible employee and adopt grievance procedures."  There was no grievance
procedure n 1995-1998 when the plaintiff, Kloth-Zanard, first began her
association with CT's DSS and when she was denied her education, which
violated her DV rights.

x) In 1995, there was also no "designated responsible employee" to "ensure that
individuals dealing with large agencies are able to easily find a responsible person
who is familiar with the requirements of the ADA and thus impart and
communicate those requirements to other individuals in the agency who may be
unaware of their responsibilities."

y) Furthermore, the fact that the Plaintiff never even received a single point of
contact, DV counseling, let alone protection but was instead ordered to divulge
who the father of her child was, despite a permanent restraining order, was not
only a serious violation and welfare endangerment of mother and daughter but
clearly shows that the employees were not properly educated or ignored the
Plaintiff's DV trauma and the hidden disabilities associated to being a victim of
DV.  It also shows that the state and its agencies were not in compliance with
Section 35.107a and it's sister section 36 to appoint a designated employee to

ensure that the Entities and their employees complied with Title II and its subsequent rules and regulations.

z) This notification applies not only to walking into any building but also to any communications including phone calls received, or made, emails or letters.

aa) There was no affective communication nor proper notification to the plaintiffs and is evidenced by the state and its agencies own submitted evidence of forms and spreadsheets created or used back in 1995-2004.  Furthermore, when in 2012, Plaintiff Kloth-Zanard repeatedly wrote and called and emailed DSS to inform them that she needed assistance to present her case to have the lien removed off of her and her property, DSS repeatedly denied any modification or accommodations or refers for assistance including never providing the plaintiff with even written information about her ADA rights.  In fact, the Plaintiff was told that despite her disabilities she would NOT need an attorney at the Fair Hearing for the Lien, nor did she need any help if she could not afford an attorney.  Thus DSS and DCF provided no effective communication for someone with hidden disabilities and further segregated her and treated her differently than all other clients who were NOT disabled by not leveling the playing field during the fair hearing for someone who's disabilities put her at a disadvantage.

bb) Lack of compliance with ADA rules and regulations was clearly addressed in Raymond v  Rowland, United States District Court, 3:03cv0118 (MRK), and shows that DSS and DCF were not in compliance even back in 2004.

cc) As well, under Olmstead vs. LC were the Supreme Court of the United States Eleventh Circuit Court of Appeals, No. 98-536, DSS and DCF were obligated to offer Modifications that a Client could reference or refer to.

dd) Moreover, Section 504 of the Federal Rehabilitation Act of 1973 (Section 504) and Title II of the Americans with Disabilities Act of 1990 (ADA) protects parents and prospective parents with disabilities from unlawful discrimination in the administration of child welfare programs, activities, and services. The plaintiff, Kloth-Zanard was denied repeatedly and discriminated against for her hidden disabilities by DSS and DCF when her access an education in 1995 and then threatened the welfare of her daughter and herself if she attended school anyway.

ee) The plaintiff's fundamental inalienable rights were violated and Discriminated against and thus are a violation of the 14th Amendment of the U.S. Constitution, which protects a citizen from being judged unfairly or treated unfairly because of their differences to another or group of others. In DSS's denial of the Plaintiff, Kloth-Zanard's education in 1995 despite DV polices and rules and then the false placement of Plaintiffs, Kloth-Zanard and Zanard, on the DCF Abuse and Neglect Registry falsely are prime examples of these violations as both segregated and prevented the Plaintiffs from being gainfully employed and accepted in society. (Tennessee v. Lane, in the Supreme Court of the United Stats, **No. 02-1667).**

ff) Our laws were created to Remedy the Past, Eliminate the Current Issues and Prohibit the future damages. Clearly, while these rights and rules were set in place to do this, the State of CT and it's agencies ignored them in the case of the

Plaintiffs especially in light of the fact that compliance with the ADA policies had to begin by January 26, 1992, 3-years prior to when the plaintiff's first complaint began and to this date are still out of compliance including the plaintiff Kloth-Zanard's latest issue with a bogus lien that was placed in 2012 upon her property and herself.

gg) More poignantly, is that at any point during the plaintiff's lien fair hearing, Hearing Officer Tar could have accommodated the Plaintiff's disabilities and asked her if she needed time to compose herself. Because of this, Plaintiff did not receive equal access to the Fair Hearing/Court Process and had her hearing prematurely closed down.  Popovich v. Cuyahoga County Court of Common Please, Domestic Relations Division, 6th Circuit court of Appeals, Rule 206, Nos. 98-4100/4540, 2001-2002.  Olmstead, Commissioner, Georgia Department of Human Resources, *et al. v. L. C.*,  No. 98-536  Argued April 21, 1999--Decided June 22, 1999,. ADA  Raymond v Rowland, Civil Action No. 3:03CV0118 (MRK)  United States District Court – District of Connecticut.

hh) Under the ADA laws, the Plaintiff repeatedly asked for modifications, assistance and accommodations but was repeatedly denied.  Once informed of her request for ADA accommodations and modifications, the State and it's Agency were on notice and their sovereign immunity revoked.

ii) Federal/State of CT ADA Regulations § 35.130 and it's sister section 36: General prohibitions against discrimination.  Supreme Court's decision in *Olmstead v. L.C.*, a ruling that *requires states to eliminate unnecessary segregation of persons with disabilities and to ensure that persons with disabilities receive services in the*

*most integrated setting appropriate to their needs.* Lane, Jones vs. State of TN, 6th Circuit of Appeals, No. 98-6730, 2003. Popovich v. Cuyahoga County Court of Common Please, Domestic Relations Division, 6th Circuit court of Appeals, Rule 206, Nos. 98-4100/4540, 2001-2002. Olmstead, Commissioner, Georgia Department of Human Resources, *et al. v.* L. C., No. 98-536. Argued April 21, 1999--Decided June 22, 1999, *et al. v.* L. C., No. 98-536. Argued April 21, 1999--Decided June 22, 1999. ADA Raymond v Rowland, Civil Action No. 3:03CV0118 (MRK) United States District Court – District of Connecticut.

jj) The following excerpts come directly from the DOJ concerning Title II and 504 of the Rehabilitation Act.

  i) Under the ADA and Section 504, programs cannot deny people with disabilities an opportunity to participate, and must provide people with disabilities with meaningful and equal access to programs, services, and activities. Programs and services must be accessible to and usable by people with disabilities. In addition, programs must provide people with disabilities with an equal opportunity to participate in and benefit from the programs, services and activities of the entity; they are also prohibited from using methods of program administration, which includes written rules as well as agency practices, that have a discriminatory effect on individuals with disabilities. Moreover, programs must provide reasonable modifications in policies, practices, and procedures when necessary to avoid discrimination; and must take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with

disabilities are as effective as communications with others through the provision of auxiliary aids and services.  Plaintiff, Kloth-Zanard was denied these rights starting in 1995 when she was denied her education.

ii) Congress has made clear that the definition of disability in the ADA and Section 504 is to be interpreted broadly.  Even if an individual's substantially limiting impairment can be mitigated through the use of medication; medical supplies, equipment, and devices; learned behavioral or adaptive neurological modifications; assistive technology (e.g. a person with a hearing disability who uses hearing aids that substantially restores the sense of hearing); or reasonable modifications to policies, practices, or procedures, the individual is still protected by the ADA and Section 504.  The ADA and Section 504 also apply to people who have a record of having a substantial impairment (e.g., medical, military, or employment records denoting such an impairment), or are regarded as having such an impairment, regardless of actually having an impairment.

iii) Like child welfare agencies, courts must also make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination on the basis of disability.  For example, it may be necessary to adjust hearing schedules to accommodate the needs of persons with disabilities, if the need for the adjustment is related to the individual's disability.  Or it may be necessary to provide an aide or other assistive services in order for a person with a disability to participate fully in a court event.

iv) Examples of auxiliary aids and services include, among others, qualified interpreters, note takers, computer-aided transcription services, accessible electronic and information technology, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, qualified readers, taped texts, audio recordings, braille materials, large print materials, and modifications to existing devices.  Thus the courts denial of the e-filing on any of the plaintiffs cases is a violation of her Title II and 504 Rehabilitation Rights   28 CFR § 36 204 Administrative methods.

v) A public accommodation shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control.

vi) Title II and Section 504 allow for declaratory and injunctive relief, such as an order from a court finding a violation and requiring the provision of reasonable modifications.  Title II and Section 504 also allow for compensatory damages for aggrieved individuals   Individuals who prevail as parties in litigation may also obtain reasonable attorney's fees, costs, and litigation expenses.

vii) Under Section 504, remedies also include suspension and termination of Federal financial assistance, the use of cautionary language or attachment of

special conditions when awarding Federal financial assistance, and bypassing recalcitrant agencies and providing Federal financial assistance directly to sub-recipients.

viii)    Furthermore, Attorney General Richard Blumenthal signed off on the following:

(1) "In contrast to the overbreadth of the reasonable accommodation standard of Title I, which was a central part of the *Garrett* Court's analysis, Title II's analogue, reasonable modification, appropriately effectuates the states' constitutional responsibilities.  The protection of fundamental rights often requires a state to do more than simply refrain from discriminating against its citizens.  This and other courts have found that states are constitutionally required "to shoulder affirmative obligations" to ensure meaningful access to public services, as well as abolish barriers preventing such meaningful access.[if !supportFootnotes][21][endif]  *Bounds v. Smith*, 430 U.S. 817, 824-25 (1977) (holding that fundamental right of access to courts required state to provide inmates with adequate law libraries or adequate assistance from persons trained in the law, while economic factors may be considered in choosing method to provide meaningful access, "the cost of protecting a constitutional right cannot justify its total denial"); *Katzenbach v. Morgan*, 384 U.S. 641 (1966) (upholding Voting Rights Act ban on voting literacy tests although literacy tests themselves do not violate the Equal Protection Clause; destruction of this barrier enabled individuals to better "obtain 'perfect equality of civil

rights and the equal protection of the laws'") (citations omitted); *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 72 (2002) (finding that state could be required to provide accommodation to hearing-impaired father in child custody proceedings both under Title II and as a matter of due process); *Amadon v. Immigration & Naturalization Serv.*, 226 F.3d 724 (6th Cir. 2000) (holding that due process right to full and fair deportation hearing required government to provide competent foreign-language interpreter)."

(2) "In the same fashion as the cases cited above, Title II's "reasonable modification" provision enables people with disabilities to obtain their constitutionally guaranteed rights. Therefore, this provision is consistent with states' constitutional responsibilities."

(3) "This Court recently forcefully reiterated the importance of effectuating Congress's remedial purpose when analyzing congruence  *See Hibbs*, ___ U.S. ___, 123 S. Ct. 1972. The *Hibbs* Court upheld the FMLA despite its inclusion of a mandatory twelve-week leave provision. The Court recognized that without the mandatory leave, an employer could treat males and females equally by providing for no leave whatsoever, a result "which would not have achieved Congress's remedial object." *Id.* at 1983. Similarly, a simple mandate of equal treatment of the disabled and non-disabled would fail to achieve Congress' remedial goals here. Thus, just as the twelve-week leave provision in the FMLA met the congruence factor in *Hibbs*, the reasonable modification requirement in Title II meets

the congruence factor here."

## COUNT 2:  VIOLATION OF EDUCATIONAL RIGHTS

2) As previously stated, at the time of this discovery of the Plaintiff's false placement by DCF on the Abuse and Neglect Registry, Plaintiff Kloth-Zanard also discovered that her rights to an education under the Welfare Reform act and Domestic Violence Laws were violated by DSS.  Plaintiff Kloth-Zanard came to the State of CT as a domestic violence victim, single mother and homeless with an 11-month-old child.  She came to CT to complete her degree in Physical Therapy so she could be self-sufficient and raise her child on her own.  DSS refused to let her complete her last 18 months of education that she came to CT to complete at Sacred Heart University, despite the following statues and laws under Welfare Reform:

a) In January 1993, a task force adopted essential guiding principles for a successful welfare-to work program and final recommendations were organized by these principles.  Welfare Reform Act Recap 2006:

i) An Act Concerning Welfare Reform and The Expenditures Of The Department of Social Services (PA 97-2, June 18 Special Session) The act exempts Temporary Family Assistance applicants and recipients who are victims of family violence from job training, work placement assistance, subsidized and unsubsidized employment, and child support enforcement requirements. It defines a domestic violence victim as someone who has been battered or subjected to extreme cruelty by (1) physical acts that resulted in, or threatened to result in, physical injury; (2) sexual abuse; (3) sexual activity involving a child in the home; (4) being forced to participate in sexual acts;

(5) mental abuse; or (6) neglect or medical care deprivation. 6. Access to quality child care, quality educational opportunities, adequate health care, and decent housing are essential to supporting self-sufficiency. October 2, 2009, 2009-R-0349, SUMMARY OF FAMILY VIOLENCE LAWS, By: Sandra Norman-Eady, Chief Attorney

b) Furthermore, the defendant's constructively concealed evidence from the plaintiff, Kloth-Zanard, related to Welfare Reform laws and rules when they did NOT disclose Governor Rowland's circumventing of the Federal Welfare Reform laws or disclosed her rights as a Domestic Violence Victim and obtaining an education. No explanation of benefits were ever presented, explained or otherwise. And No proof exists that the Plaintiff was informed of any of these new laws and rules. Plaintiff has now discussed this with several retired Social Services caseworkers who admit that explanation of services and the new Welfare Reform were NEVER divulged to the recipients and definitely never in writing.

c) Due to the defendant's unconscionable actions, Plaintiff Kloth-Zanard did not even realize until 2009 the extent of how much she was suffering from anxiety and stress related to these harmful acts and the domestic violence she had been a victim of. Plaintiff Kloth-Zanard's disability actually dates back to 1993 when she became a homeless battered pregnant single parent, and then attempted to move to CT in January 1995.

d) Furthermore, when Kloth-Zanard's education rights were violated by DSS in 1995, they actually took advantage of her duress and stress of being a homeless single mom and domestic violence victim. They told her that if she tried to go

back to school, they would take away her Section 8 housing, food stamps and energy assistance.

i)   This violated her educational rights under Welfare to Work and Welfare Reform whose sole purpose was to help parents become self-sufficient.

ii)   This action further violated her Domestic Violence rights under the Family Violence Laws: An Act Concerning Welfare Reform and The Expenditures Of The Department of Social Services (PA 97-2, June 18 Special Session)

## COUNT 3:  VIOLATION OF FIDUCIARY RESPONSIBILITY TO NOTIFY THE PLAINTIFFS OF THE REGISTRY LISTING

3)   It was the Department of Children and Families Services and their employees' fiduciary responsibility to legally notify the Plaintiffs in writing about the placement of their names on the Abuse and Neglect Registry as well as the removal of their names once the judge exonerated the plaintiff and dismissed the charges with prejudice.

## COUNT 4: VIOLATION OF FIDUCIARY RESPONSIBILITY TO NOTIFY THE PLAINTIFF OF TRUE EDUCATION RIGHTS UNDER WELFARE REFORM AND THE FAMILY VIOLENCE ACT IN 1995.

4)   It was the Department of Children and Families Services and their employees' fiduciary responsibility to legally notify the Plaintiff of her True Legal Rights to an education under the newly enacted Welfare Reform and Family Violence Acts,

## COUNT 5: VIOLATION OF 5TH AND 14TH AMENDMENT FOR DUE PROCESS RIGHTS

5) Under 42 U.S. Code § 1983 - Civil action for deprivation of rights, the Plaintiff's have a right to sue the state for damages under the 5th and 14th amendments pertaining to the Due Process Clause.

a) Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

i) Declaratory decree was violated and relief is possible as these were direct violations of the plaintiffs' civil rights and ability to redress at the time of the placing of their names on the Abuse and Neglect Registry as well as Educational Violations. Plaintiff's were not afforded these rights as they were unaware of the violations in the first place as this information was concealed

purposely from them, and their names falsely put on the abuse and neglect registry such that they would never know unless someone told them.

ii) Layne R. Meacham v. Lisa Church, United States Court of Appeals for the Tenth Circuit on appeal from the District of Utah (Salt Lake County) Docket no.11-4161 (This social worker got a monetary settlement when he was falsely put on the Abuse and Neglect Registry, though not very much because of errors he made in his case.)

b) Furthermore as Plaintiff's were unaware of their listing on the registry, their Due Process Rights, for removal of their names initially and during the subsequent 15 years, were violated. As the Juvenile judge exonerated, dismissed and had all charged removed/reversed, the understanding was that the Plaintiff had no charges against them and thus no reason to believe they had been placed on any list. But if placed there, the law required that their names be removed forthwith per the Procedural Due Process related to DCF investigations. Valmonte v Bane, 18 F.3d 992 (2d Cir. 1994)

c) Plaintiffs Fourteenth Amendment right were violated by DCF when it placed them falsely on the Abuse and Neglect registry and did not remove their names after a finding of not guilty with all charges dismissed and the plaintiff exonerated and would be considered "economic abuse", This falls under §1983, where in the plaintiff alleges (1) the deprivation of a right secured by the Constitution or laws of the United states (2) which has taken place under color of state law." Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir.1997).

d)  Under Federal & State Law as well as the 14th Amendment of the constitution,
the Plaintiffs had a right to Redress and Due Process rights to have removed their
names from the list in a timely manner.   Without proper notification by the State
and its agency, they were denied their due process rights.  But the DCF was well
aware by at least February 1998, that the Plaintiff and her spouse had been
exonerated and their names should have been removed in a timely manner from
that date as noted in their own DCF records several times between November
1997 and February 1998.

e)  Furthermore as Plaintiff was unaware of her legal rights, her Due Process Rights
to complete her education were violated.  The Plaintiff, not being an attorney or
having readily accessible information on her educational rights under Welfare
Reform and the Family Violence act was violated per the Procedural Due Process
related to DSS rules and regulations.  Valmonte v Bane, 18 F.3d 992 (2d Cir.
1994)

f)  Plaintiff's inability to afford an attorney or to have easy open access to the laws
applicable under Welfare Reform and Family Violence Act would be considered
"economic abuse". This falls under §1983, where in the plaintiff alleges (1) the
deprivation of a right secured by the Constitution or laws of the United states (2)
which has taken place under color of state law." Rodriguez v. Weprin, 116 F.3d
62, 65 (2d Cir.1997).

g)  Under Federal & State Law as well as the 14th Amendment of the constitution,
the Plaintiff had a right to Redress and Due Process rights to complete her
education that she came to CT for.  Without proper notification by the State and

its agency of her true rights under Welfare Reform and Family Violence Act, she was denied her due process rights. But DSS was well aware of the laws in by January 1995 when Welfare Reform went into affect and failed under their Fiduciary Responsibility to notify the plaintiff and apply those rules.

## COUNT 6:  VIOLATION OF 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES

6)  During the Fair Hearing process that was prematurely ended, Plaintiff, Kloth-Zanard, never got her chance to confront the state's only witness, Caseworker Gillette. This is a violation of her 6th Amendment right to confront accuser and their witnesses  Had the Plaintiff had this opportunity, she would have been able to prove that the Caseworker had no evidence to validate the "reconstructed spreadsheet". That he had no real knowledge of how the figures were arrived at. That he was not rhe the person who created the spreadsheet. Nor was he ever her caseworker in 1995-1998 or did he know who her caseworkers were and thus had no true first hand knowledge of her case. He was only a 3rd party, basing his testimony on hearsay evidence.

## COUNT 7:  VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1985

7)  The state and it's agency thus conspired to interfere with the Plaintiff's civil rights in violation of 42 U.S.C. § 1985 (3) that of Depriving persons of their rights or privileges.

a)  If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

b) DSS did intimidate and terrorize the Plaintiff, Kloth-Zanard, in 1995 when they refused to allow her to attend College at Sacred Heart University to complete the last months of her education that she was entitled to under the Family Violence Laws and Regulations that protected Victims of Domestic Violence who might require assistance under Welfare Reform. Furthermore, they threatened to revoke all of her housing assistance and food assistance if she attended. Not only did this violate her constitutional rights, her rights under the Family Violence Law, but it

violated the premise of the Welfare Reform Act, which was to help families become self-sufficient. (An Act Concerning Welfare Reform and The Expenditures Of The Department of Social Services (PA 97-2, June 18 Special Session)

## COUNT 8: DEFAMATION

8) The state and its agency did violate state law including intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, economic abuse, violation of privacy and defamation. As these are civil rights, the Appellate and Supreme courts held that Sovereign Immunity does not cover state or federal agencies for these transgressions.

   a) Defamation - 3.11-1 Defamation The plaintiff alleges that (he/she) was defamed by the defendant. (Libel/Slander) is a form of defamation. The plaintiff's claim in this case is based on (libel/slander). A defamatory statement which was a false communication that intends to harm the reputation of another; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held; to deter third persons from associating or dealing with (him/her); or to excite adverse, derogatory, or unpleasant feelings or opinions against (him/her). Statements claimed to be defamatory should be given their ordinary meaning, which is the same meaning that people of common and reasonable understanding would give to them in the context and under all the circumstances that were present at the time they were made. In determining whether a statement is defamatory, you are not bound by the interpretation of the statement offered by the plaintiff, the

defendant or by any person hearing the statement. If the meaning of the statement is unclear, it is your job as the jury to determine what the meaning of the statement was. Authority  Craig v. Stafford Construction, Inc., 271 Conn. 78, 84 (2004); Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217 (2004); Yavis v. Sullivan, 137 Conn. 253, 260 (1950); Gagnon v. Housatonic Valley Tourism Commission, 92 Conn. App. 835, 847-48  (2006); Gambardella v. Apple Health Care, Inc., 86 Conn. App. 842, 848 (2005); Lowe v. Shelton, 83 Conn. App. 750, 765, cert denied, 271 Conn. 915 (2004); 3 Restatement (Second), Torts § 559, p. 156 (1977); 3 Restatement (Second), Torts § 577, p. 201 (1977).

i)  Defamation is not protected by the First Amendment wherein statements are made, which is clearly false and meant to cause harm. The Plaintiff's were defamed by the State and it's Agency's actions when they falsely put them on the Abuse and Neglect Registry alleging or imputing a statement that was determined in a court of law on November 18, 1997, the petition for neglect was withdrawn and the case closed. This was also reiterated in court on December 08, 1997 in court. DCF Worker, Barbara Hatch, again reiterates in her reports on December 8, 1997 and January 26, 1998, that the neglect petition is withdrawn and the case is closed. This is against reiterated in the Plaintiff's files on February 25, 1998. Thus no substantiated charges of neglect.

ii)  Statements are defamatory per se where they falsely impute to the plaintiff one or more of the following things:

iii) Allegations or imputations "injurious to another in their trade, business, or profession"

iv) Allegations or imputations of criminal activity (sometimes only crimes of moral turpitude.

b) DCF, and its' employees actions caused a stigma upon the plaintiffs that to this day still exists, despite removal of their names from the registry. Having lost 15 years of work history and experience, it has stigmatized their ability to provide any kind of consistent work history to assist with gainful employment. To state a claim under §1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United states (2) which has taken place under color of state law." Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir.1997). Plaintiff's allege many constitutional violations and civil rights violations, including Loss of Employment, Loss of Education, Loss of Liberty, Loss of Reputation, Mental Pain and Suffering, Loss of Enjoyment of Life and other such violations.

i) [T]o state such a claim a plaintiff must allege a "stigma," which is "the utterance of a statement about [him] that is injurious to [his] reputation, that is capable of being proved false, and that he ... claims is false," and a "plus," which is "some tangible and material state-imposed burden in addition to the stigmatizing statement." Velez v. Levy, 401 F.3d 75, 87 (2d Cir.2005) (internal quotation marks and alterations omitted) "[T]he 'plus' imposed by the defendant must be a specific and adverse action clearly restricting the plaintiff's liberty-- for example, the loss of employment, or the termination or alteration of some other legal right or status." Id. at 87-88 (internal quotation

marks and citation omitted). A negative impact on "job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation," is insufficient. Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir.1994). Boss v. Kelly, 306 Fed.Appx. 649, 651 (2d Cir.2009); see also Valmonte, 18 F.3d at 1002 ("We hold that Valmonte has adequately stated a cause of action for deprivation of a liberty interest not merely because of the defamatory aspect of the Central Register, but because that defamation occurs in conjunction with a statutory impediment to employment.").

ii) Plaintiff Kloth-Zanard was found not guilty and exonerated by a court of law. Thus DCF's placing of the Plaintiffs names on the Abuse and Neglect registry would constitute a "stigma" as it barred her from gainful employment in her field of expertise for over 15 years and destroyed Plaintiff Zanard's reputation and employability. This also affected her reputation and self-esteem, as she could not understand why with her extensive training that she could not get a job or once employed, would loose her job. This ultimately caused her to become disabled with extreme stress and anxiety.

iii) Further in relation to Stigma Plus from the Registry Listing: United States Court of Appeals, Ninth Circuit., Craig Arthur HUMPHRIES; Wendy Dawn Aborn Humphries, Plaintiffs-Appellants, v. COUNTY OF LOS ANGELES; Leroy Baca, individually and in his official capacity as Los Angeles County Sheriff; Michael L. Wilson, individually and in his official capacity as a Detective and/or Deputy of the Los Angeles County Sheriff's Department;

Charles T Ansberry, individually and in his official capacity as a Detective of the Los Angeles County Sheriff's Department, Bill Lockyer, Attorney General, in his official capacity as Attorney General of the State of California, Defendants-Appellees., No. 05-56467., Decided: November 5, 2008

iv) Stigma: As the district court found, being labeled a child abuser by being placed on the CACI is "unquestionably stigmatizing."   We have observed that there is "[n]o doubt . that being falsely named as a suspected child abuser on an official government index is defamatory."   Miller v. California, 355 F.3d 1172, 1178 (9th Cir.2004); see also Valmonte v. Bane, 18 F.3d 992, 1000 (2d Cir.1994) (finding it beyond dispute that inclusion on a child abuse registry damages reputation by "branding" an individual as a child abuser).

v) The Court has identified stigma on the basis of lesser accusations.   In Constantineau, the chief of police had posted the plaintiff's name on a list that prohibited her from purchasing alcohol pursuant to a state statute forbidding the sale of alcoholic beverages to persons who had become hazardous by reasons of their "excessive drinking."   400 U.S. at 434-35, 91 S.Ct. 507   In Paul, the plaintiff's picture appeared on a flyer of individuals who were suspected of shoplifting.   424 U.S. at 695, 96 S.Ct. 1155.   In both cases the Court found stigma.   Constantineau, 400 U.S. at 435-37, 91 S.Ct. 507; Paul, 424 U.S. at 697, 701, 96 S.Ct. 1155 (stating that imputing criminal behavior to an individual is generally considered "defamatory per se" and implicitly finding stigma by holding that stigma alone is insufficient).   Being labeled a child abuser is indisputably more stigmatizing than being labeled an excessive

drinker or a shoplifter. Indeed, to be accused of child abuse may be our generation's contribution to defamation per se, a kind of moral leprosy.

vi) In application of the Plus standard, the Plaintiffs contend that their case passes the Plus test as follows:

    (1) Defamation and Destruction of their reputation by placement on the registry.

    (2) The plaintiff's rights were extinguished by this placement on the registry.

    (3) The Plaintiff's ability to be gainfully employed, especially Plaintiff, Kloth-Zanard, whose primary education was working with families and children, was barred by the registry placement.

    (4) The regular checking of the registry by businesses and state agencies especially those relying on the registry for employees who work with families and children further hindered employability.

    (5) Placed and never removed despite exoneration on November 18, 1997, caused irreparable damages.

vii) As the Court explained in Paul, when the chief of police in Constantineau posted the plaintiff's name on a list forbidding the sale of alcohol to her, it "significantly altered her status as a matter of state law" by depriving her "of a right previously held under state law[-]the right to purchase or obtain liquor in common with the rest of the citizenry." Paul, 424 U S at 708, 96 S.Ct. 1155. The Court concluded that "it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards." Id. at 708-09, 96 S.Ct. 1155.

(1) Paul provides that stigma-plus applies when a right or status is "altered or extinguished." 424 U.S. at 711, 96 S.Ct. 1155 (emphasis added).

(2) The court held that where a state statute creates both a stigma and a tangible burden on an individual's ability to obtain a right or status recognized by state law, an individual's liberty interest has been violated. A tangible burden exists in this context where a law effectively requires agencies to check a stigmatizing list and investigate any adverse information prior to conferring a legal right or benefit. As outlined above, California created the CACI via CANRA and explicitly requires agencies to consult the CACI and perform an independent investigation before granting a number of licenses and benefits. This requirement places a tangible burden on a legal right that satisfies the "plus" test.

(3) The court found that a tangible burden also exists where the plaintiff can show that, as a practical matter, the law creates a framework under which agencies reflexively check the stigmatizing listing-whether by internal regulation or custom-prior to conferring a legal right or benefit. CANRA appears to create such a legal framework. CANRA explicitly provides that a variety of agencies will have access to the CACI, and we cannot turn a blind eye to the actions of these other agencies merely because they are not explicitly required by statute to receive CACI information.

(4) In the above cases, an agency charged with protecting "California's" children-through granting or denying licenses to work in child care, allowing people to engage in adoption or child-placement services, or

considering potential Court Appointed Special Advocates-would fail to consult the CAC1. There is possibly no information more relevant to determining whether a person should be permitted to have a license to work or care for children than whether that person has abused an innocent child in the past. See Juarez v. Boy Scouts of Am., Inc., 81 Cal.App.4th 377, 97 Cal.Rptr.2d 12, 24-25 (2000)

(5) In the case of the Humphries, the CANRA both stigmatizes and creates an impediment to the Humphries' ability to obtain legal rights. The Humphries have asserted the existence of a sufficient liberty interest under the stigma-plus test, of which they may not be deprived without due process of law.

(6) In reaching this holding, we find the Second Circuit's reasoning in Valmonte v. Bane persuasive. 18 F.3d 992 (2d Cir.1994). In Valmonte, the Second Circuit heard a challenge to the New York Central Register of Child Abuse and Maltreatment. Under the New York scheme, the Department of Social Services determined whether an allegation of child abuse was "indicated" or "unfounded." Id. at 995. If there was "some credible evidence" supporting a complaint, the report was deemed "indicated" and went into the Central Register; otherwise, it was deemed "unfounded," expunged from the Central Register, and destroyed. Id. As in California, state agencies, private businesses, and licensing agencies were required to check whether potential employees or applicants were on the Central Register. Id. The agency or business could hire the person

only if the employer maintained a written record explaining why the person was suitable for employment or a license. Id. at 996. The court found that because agencies and employers would learn of Valmonte's inclusion on the Central Register "by operation of law, and likely will choose not to hire her due to her status" the New York scheme "[did] not simply defame Valmonte, it place[d] a tangible burden on her employment prospects." Id. at 999, 1001. The Second Circuit explained that "[t]his is not just the intangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state." Id. at 1001. Valmonte stands for the proposition that to satisfy stigma-plus, a child abuse registry does not need to create a per se bar to employment; it is sufficient that a child abuse registry, by operation of law, creates a "statutory impediment" or a "tangible burden" to being hired. Id. at 1001-02. See also Dupuy v. Samuels, 397 F.3d 493, 503-04, 509-11 (7th Cir 2005) (finding that where "child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies" a protected liberty interest is "squarely implicate[d]" under Paul ).

## COUNT 9:  SLANDER AND LIBEL

9) Defendant's Actions were Libelous/Slanderous CT Tort 3.11-2, as it was a written defamation of the plaintiffs names to place them on the registry.  It is the publication of defamatory material by either written or printed words, or by some other form of printed communication that has the same potential harmful characteristics associated with written or printed words.  Authority, Gagnon v. Housatonic Valley Tourism Commission, 92 Conn. App. 835, 847 (2006).  Sometime after August 1997, DCF falsely put the Plaintiff's names on the abuse and neglect registry.  Despite orders from a judge on November 18, 1997 and December 8, 1997, and repeated documentation in the Plaintiff's files that the petition was withdrawn and the charges unsubstantiated, DCF continued to leave the plaintiff's names on the Abuse and Neglect registry.  The Plaintiff's were never formally notified of this registry listing in writing or even verbally in order to request the removal of their names.

## COUNT 10:  PERJURY, 18 U.S. CODE § 1621 – PERJURY GENERALLY

10) The plaintiffs contend that the placement of their names on the registry constituted Perjury, 18 U.S. Code § 1621 – Perjury generally.  Whoever---

a) Perjury, 18 U.S. Code § 1621 – Perjury generally (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

b) Perjury, 18 U.S. Code § 1621 - Perjury generally (2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

i) is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

## COUNT 11:  LOSS OF LIBERTY

11) The plaintiffs contend that the placement of their names falsely on the registry and then not being removed in a timely manner caused a Loss of Liberty in the destruction of their reputation and employability.  Once their names were placed upon this list, it prevented them from obtaining meaningful employment and this impeded their ability to fully enjoy their lives as they were now placed into serious financial devastation.  In McFarlane v Roberta, D. CONN. UNITED STATES DISTRICT COURT, D. CONNECTICUT. CIVIL ACTION NO. 3:11–CV–00878 (JCH). 2012-08-30 CRYSTAL MCFARLANE, ET AL, PLAINTIFFS, V. JAN ROBERTA, ET AL, DEFENDANTS, The court construes Ms. McFarlane's claim as a violation of her Fourteenth Amendment rights to procedural due process for the deprivation of a liberty interest. This circuit has recognized claims based on similar assertions of a liberty interest in such official actions that may affect an individual's reputation.  Loss

of Liberty & Enjoyment of Life . (Tillman v. the state of Connecticut, Ireland v. the

State of Connecticut, awarded: 2.25mil-2.75mil)

a) Even if the state and DCF where to claim that back in 1997 it was common

   practice to put someone's name on the list while they were being investigated, this

   has been ruled illegal because it violates the Due Process of our US Constitution

   to a hearing.  Missouri Supreme Court Circuit Judge Richard Callahan concluded

   that people's reputations and professional careers were damaged when their names

   were placed in the child abuse registry before a due-process hearing. 2005.

   Mildred Jamison, et al., Respondents v. State of Missouri, Department of Social

   Services, Division of Family Services, Appellant., SC87360, 03/13/2007, Circuit

   Court of Cole County, Hon. Richard G. Callahan

b) Furthermore, once exonerated, it was the Departments responsibility to remove

   their names if it was common practice to put their names on this list.

c) The plaintiff's loss of the life and liberties they could have had if they had not

   been falsely convicted and placed on the registry which prevented them from

   reaching their life potential during the prime years of their lives. This prevented

   them from obtaining the normal achievements and financial stability that they

   should have been able to attain had employability not been blocked.  This in turn

   directly and proportionately affected the Plaintiff's ability to financially provide

   for their family, save money, have pensions, 401k or anything left when they

   retired or become older.

COUNT 12:  LOSS OF REPUTATION

12) Plaintiff contend that they had a positive reputation in the business world prior to
1997.

a)  With the placement of their names on the Registry list, falsely and maliciously,
changed the business world view of them and thus prevented appropriate
employment based on their skills and training.  (Tillman v  the state of
Connecticut, Ireland v. the State of Connecticut, awarded: 100k-150k)

b)  Plaintiff's reputation prevented her from even obtaining Volunteer work in 2012
with CASA CIP.

c)  Plaintiff's reputation has prevented her from even being hired as a Guardian Ad
Litem despite completion of the training program and extensive educational
training in Marriage and Family Therapy.

d)  Plaintiff Kloth-Zanard's training includes:

i)  1997: Computer Training

ii)  1997: Self-employment Certification

iii) 2001: BS in Health and Psychology

iv) 2006: Masters in Marriage and Family Therapy

v)  2009: Certification in Recovery Support Specialist

vi) 2009: Certification in ABI

vii) 2013: State of CT Guardian Ad Litem Training

COUNT 13:  MENTAL PAIN AND SUFFERING

13) Mental Pain and Suffering, which deteriorated and exasperated into Physical Pain and

   suffering. (Tillman v. the state of Connecticut, Ireland v. the State of Connecticut,

   awarded: 250k-300k and 1mil-1.5mil)

   a)  Plaintiffs have spent years in therapy trying to hold their marriage together caused

      by lack of proper employment that led to financial devastation that directly

      affected their marital relationship.  This marital stressors are directly related to

      false conviction and listing on the registry which prevent proper employment and

      ultimately caused Plaintiff Kloth-Zanard to be disabled from the stress and

      anxiety further exasperating their marital situation.

   b)  Kloth-Zanard is now disabled with PTSD, Anxiety, Stress and Degenerative Joint

      Disease

      i)  Degenerative Joint Disease becomes exasperated with increases in stress and

         anxiety.  Dues to Financial devastation from placement on the Registry along

         with damages from DSS's denial of her original education, Plaintiff Kloth-

         Zanard's stress and anxiety are at extensive.

      ii) Kloth-Zanard has been in therapy for well over 20 years due to the distress

         caused first by DSS denial of her education and then false neglect charges,

         which culminated in her inability to be gainfully employed based on her skills

         and training.  Kloth-Zanard's not knowing why she could not be gainfully

         employed for over 15 years led to extreme stress and anxiety with her thinking

         there was something wrong with her.  Kloth-Zanard has had bouts of

         situational depression during this time and continues to have issues due to the

permanent life damages caused by the false conviction and listing on the registry.

    iii) Kloth-Zanard has been seeing at minimum one if not 2 LCSW's a week and one psychiatrist every couple of months for the past 5 years or more.

## COUNT 14:  LOSS OF EMPLOYMENT AND EARNING CAPACITY

14) Plaintiffs contend a Loss of Earnings and earning potential due to the false Placement of their names on the registry, which prevented them from any financially solvent employment potentials that would have provided financial stability during their primary years of employment.  The Plaintiff's were blocked by the false personal conviction by DCF workers and then listing them on the Registry.  This prevented their Freedom to be employed equally as someone else with the same skill/training set and thus affecting their potential earning ability.  This also affects their present future earnings as they are now 55 & 58, and have lost their primary years of work history.  (Tillman v the state of Connecticut, Ireland v. the State of Connecticut, awarded: 1.7-3 mil)

    a) Throughout this time, Plaintiff Kloth-Zanard, even went back to school for the following:

        i)   1997: Computer Training

        ii)  1997: Self-employment Certification

        iii) 2001: BS in Health and Psychology

        iv)  2006: Masters in Marriage and Family Therapy

        v)   2009: Certification in Recovery Support Specialist

vi) 2009: Certification in ABI

vii) 2013: State of CT Guardian Ad Litem Training

b) Despite all of this extensive training and education, Plaintiff Kloth-Zanard was never able to procure employment, not even with the state of CT.  In fact, the State of CT and it's human resources department never responded to her applications and worse failed to notify her repeatedly that she was on the registry list when she applied for jobs with them.

c) Furthermore, even though Plaintiff worked with many state and federal programs such as Department of Labor, Bureau of Rehabilitative Services, Workforce Investment Act Program including 2 training programs through them, to try to obtain employment, these agencies were never able to assist with employment due to her unknown registry listing.  Her resume and education were relevant enough that through these state and federal programs no issue of employment should have transpired.

d) The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." In numerous decisions, this Court "has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws. E. g., Hampton v. Mow Sun Wong, 126 U.S. 88, 100 (1976); Buckley v. Valeo, 424 U.S. 1, 93 (1976); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n. 2 (1975); Bolling v. Sharpe, 347 U.S. 497, 500 (1954)." Vance v. Bradley, 440 U.S. 93, 95 n. 1 (1979).

COUNT 15:  LOSS OF ENJOYMENT OF LIFE

15) Plaintiffs contend that if a falsely convicted person is thrown in jail and then released is eligible for damages and relief, then the Plaintiff's are also entitled to the same as the false placing of them on the Abuse and Neglect Registry caused the same or similar damages to their reputation, character, and ability to enjoy life to it's fullest potential.  See the Connecticut Innocence Project, James Calvin Tillman v. State of CT (1989, 2006, 2007), Miguel Roman v. State of CT (1988, 2008, 2011), Kenneth Ireland v. the State of CT (1989, 2009/2010, 2014), see also Michael Morton v Texas & The Tim Cole Act)

a) According to the innocence project in CT, Exoneree Compensation, which was enacted in 2008, states: A wrongfully convicted person may be awarded damages based upon: claims of loss of liberty and enjoyment of life; loss of earnings; loss of earning capacity; loss of familial relationships; loss of reputation; physical pain and suffering; mental pain and suffering; and attorney's fees and other expenses arising from or related to such person's arrest, prosecution, conviction and incarceration.  Recovery may also include expenses of employment training and counseling, tuition and fees at any state system of higher education and any other services needed to facilitate reintegration into the community. Effective: 2008.

b) Plaintiffs have been unable to get the additional training paid for by BRS and expenses for legal fees covered, yet under Exoneree Compensation, they would be eligible for these damages and more.  The courts have denied them pro-bono legal representation under the premise that their case has no merit   Clearly, the plaintiffs have now proven merit and should be awarded a pro-bono attorney.

## COUNT 16:  RIGHT TO PUNITIVE AND OTHER DAMAGES

16) The plaintiff's are entitled to punitive damages under  3.15-8  Tortious Interference -

Punitive Damages.  Authority  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn.

20, 29-31 n.8 (2000).

a)  While before May 2000, a person could be substantiated and automatically placed

on the Registry, without being told about it, this is not the situation with this case

as the Plaintiffs do NOT have substantiated charges.  In fact, a Danbury Juvenile

Court judge exonerated and dismissed the charges in 1997.  Moreover, due to the

issues prior to May 2000, "persons often found that they were denied employment

or licenses for incidents that happened decades ago, that they had gotten no notice

of, and had forgotten about," are all at a disadvantage. After May,2000, but before

October, 2005, you would be notified of a substantiation, but not told if you were

placed on the Registry.  In these cases, which were substantiated, you were denied

your right to even appeal the Registry finding.  Wherefore in this case, the

plaintiff's had NO substantiated charges, and thus this situation should never have

occurred and their names should never have been put on the registry and if put

there removed.  Furthermore, it would have been the caseworkers job to not put

the Plaintiff's names on the list or if they had, to take them off immediately after

adjudication of the plaintiff as a fit parent and all charges dismissed, withdrawn

and unsubstantiated on November 18, 1997.  (Juvenile Judge will not release

records and transcript for free and plaintiffs cannot afford the costs.  District

Court will need to make arrangements to obtain these records.)

b) Furthermore, the state would be still liable as the plaintiff, Kloth-Zanard repeatedly applied for state jobs working with children and families and thus the state had numerous opportunities over those 15 years to notify her that she was on the list

c) Because of the state's actions or inactions at times, plaintiffs financial devastation caused then to require continued State Assistance in the form of Medicaid, Food stamps, Energy assistance, Town assistance, Southbury Town assistance and continued on-going mental health treatment for the plaintiffs and their daughter.

d) Under the Supremacy Clause of the United States Constitution (Article VI, Clause 2) it provides that the Constitution, federal laws made pursuant to it and treaties made under its authority, constitute the supreme law of the land. It provides that state courts are bound by the supreme law; in case of conflict between federal and state law, the federal law must be applied. Even state constitutions are subordinate to federal law.

**PRO-SE LAWS**

17) Pro se litigants' court submissions are to be construed liberally and held too less stringent standards than submissions of lawyers. If the court can reasonably read the submissions, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with rule requirements. Boag v. MacDougall, 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed 2d 551 (1982); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80

(1957)); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972);

McDowell v. Delaware State Police, 88 F.3d 188, 189 (3rd Cir. 1996); United States

v. Day, 969 F.2d 39, 42 (3rd Cir. 1992)(holding pro se petition cannot be held to

same standard as pleadings drafted by attorneys); Then v. I.N.S., 58 F.Supp.2d 422,

429 (D N.J. 1999).

a) The courts provide pro se parties wide latitude when construing their pleadings
   and papers.  When interpreting pro se papers, the Court should use common sense
   to determine what relief the party desires.  S.E.C. v. Elliott, 953 F.2d 1560, 1582
   (11th Cir. 1992). See also, United States v. Miller, 197 F.3d 644, 648 (3rd Cir
   1999) Court has special obligation to construe pro se litigants' pleadings
   liberally); Poling v. K Hovnanian Enterprises, 99 F.Supp.2d 502, 506-07 (D.N.J
   2000).

b) "Plaintiff" has the right to submit pro se briefs on appeal, even though they may
   be in artfully drawn but the court can reasonably read and understand them  See,
   Vega v Johnson, 149 F.3d 354 (5th Cir. 1998).  Courts will go to particular pains
   to protect pro se litigants against consequences of technical errors if injustice
   would otherwise result.  U.S. v. Sanchez, 88 F.3d 1243 (D.C.Cir. 1996

## DEMAND FOR TRIAL BY JURY

18) Plaintiffs also Demand a Trial by Jury.

**WHEREFORE**, the Plaintiffs respectfully request that the Court allow this complaint to proceed and the plaintiffs given their federal and civil right chance to prove their case and damages. And however in artfully pleaded, the Plaintiff has preserved her right to transfer the case to another venue or appeal up to the United States Supreme Court. She also reserves the right to amend and correct any defects. She has also used the statute in the federal practice book that allows the practice book rules to be removed if it violates her substantive rights. And more importantly, due to all the government misconduct, it creates a situation where by the plaintiff cannot follow the rules. And Plaintiffs further request a Trial by Jury.

Respectfully submitted:

02-13-2016
_____
Date

_____
Joan Kloth-Zanard, Pro-se
320 North George's Hill Road
Southbury, CT 06488
203-770-0318

74

CERTIFICATION of SERVICE

This is to certify that a copy of the foregoing was sent via e-mail on this 13th day of February 2016, to the Defendant's attorney as follows:

State of Connecticut

Department of Social Services

Attorney General, Rosemary McGovern

Office of Legal Counsel, Regulations and Administration

25 Sigourney Street

Hartford, CT 06106-5033

rosemary.mcgovern@ct.gov

_____

Joan T. Kloth

Plaintiff, Pro-Se

320 North George's Hill Road

Southbury, CT 06488